## FAHRENWALD et al. v. REPUBLIC IRON & STEEL CO.

### No. 4787.

Circuit Court of Appeals, Third Circuit.
Sept. 23, 1932.

Henry N. Paul, of Philadelphia, Pa., and Hervey S. Knight, of Chicago, Ill., Fraley & Paul, of Philadelphia, Pa., and Lindabury, Dupue & Faulks, of Newark, N. J., for appellants.

Byrnes, Stebbins, Parmelee & Blenko, of Pittsburgh, Pa. (Walter J. Blenko and George E. Stebbins, both of Pittsburgh, Pa., of counsel), for appellee.

Before BUFFINGTON, WOOLLEY, and THOMPSON, Circuit Judges.

BUFFINGTON, Circuit Judge.

In the court below Frank A. Fahrenwald, grantee of patent No. 1,623,469, and his exclusive licensees thereunder, on February 26, 1929, brought suit charging infringement against the Republic Iron & Steel Company. The case was heard May 13, 1930, and on September 9, 1931, the trial court entered a decree adjudging that "Frank A. Fahrenwald made misrepresentations to the Patent Office in connection with his application for the Letters Patent of the United States on which the suit is founded by reason of which it is adjudged that he is not entitled to obtain in a Court of Equity the relief prayed for in the bill." No such defense was made in the answer, and no such contention made before that court.

■ Undoubtedly the patent was valid on its face on the presumption arising from its grant, and the only inquiry the court could make was as to invalidity arising by reason of the Commissioner's power to issue it as not involving invention, that the applicant was not the first and sole inventor, and other elements going into its validity. But where, as here, there is no question of the authority of the Commissioner to issue the patent, and the patent issues, and the government which grants the patent takes no steps to set it aside, the patent stands, and those charged with infringement thereof are relegated to the statutory defenses provided for by statute. In that regard the Supreme Court, in Philadelphia, W. & B. Railroad Co. v. Dubois, 12 Wall. 47, 64, 20 L. Ed. 265, citing Providence Rubber Co. v. Goodyear, 9 Wall. 788, 19 L. Ed. 566, held a defendant is "not at liberty to set up as a defence that the patent had been fraudulently obtained, no fraud appearing upon its face." Moreover, reference may also be made to Walker on Patents, §§ 321, 322, 323; Briggs v. United Shoe Machinery Co.,

239 U. S. 48, 36 S. Ct. 6, 60 L. Ed. 138; Giant Powder Co. v. Safety Nitro Powder Co. (C. C.) 19 F. 509; Railway Register Mfg. Co. v. North Hudson Co. R. Co. (C. C.) 23 F. 593; Eureka Clothes Wringing Mach. Co. v. Bailey Washing & W. Mach. Co., 11 Wall. 488, 20 L. Ed. 209. Of course, this does not mean a court may not inquire into misrepresentation made by the applicant in procuring his patent in so far as it relates to the statutory requirements for the grant of a patent. Walker (6th Ed.) vol. 1, p. 472, and Corona Cord Tire Co. v. Dovan Chemical Corp'n, 276 U. S. 358, 48 S. Ct. 380, 72 L. Ed. 610.

■ In view of these holdings, it is clear the court below was in error, and the record should be remanded for a trial, decision, and opinion on the merits. But, inasmuch as counsel on both sides say the proofs which the lower court would consider if the case were remanded are all before us, and in view of the delay incident to such a course, and of their strongly urging this court to itself dispose of the case, we have yielded to their urge and now address ourselves to the merits of the case.

■ The patent in suit is for a metallurgical furnace for annealing steel sheets and concerns especially the rolls thereof, or, as described in a claim, "a plurality of parallel, horizontal, hollow metal rolls, each roll having a bearing portion extending outside of said furnace bearings for said rolls located outside of said furnace, means for heating that portion of the interior of each roll which lies inside the furnace to the full furnace temperature, and means for preventing the flow of such heat by fluid convection toward either end of said roll." Without entering further into the alleged meritorious, original, and inventive character of the patent, and for present purposes assuming, but only assuming, it is valid and infringed, we address ourselves to the underlying and decisive question whether Fahrenwald was the sole inventor of the patented device. In considering that question, we limit ourselves to ascertaining whether Fahrenwald was the inventor, the sole inventor, thereof, and we do not concern ourselves with who was, or were, the inventors thereof, for, as said by the Supreme Court in Alexander Milburn Co. v. Davis-Bournonville Co., 270 U. S. 390, 46 S. Ct. 324, 325, 70 L. Ed. 651, "it is not necessary to show who did invent the thing in order to show that Whitford did not."

The proofs show that Fahrenwald was connected with the American Manganese Steel

Company of Chicago. Following up his business, he came to the plant of the Sharon Steel Hoop Company at Sharon, Pa. Prior thereto, that company had tried both solid and water-cooled rolls, but they had not proved satisfactory, and they proposed to use noncooled ones in a furnace of well-known make called the Costello furnace. In that respect the proof by Malborn, the general superintendent of the mill, is: "You understand correctly that before Dr. Fahrenwald came here we had discussed among ourselves a number of times that we wanted some dry shafts in that furnace. * * * After the Duraloy shafts had been used and taken out we still discussed using a non-cooled shaft in the Costello furnace and talked to various foundries but nobody had the courage to tackle it, and then, as far as I can recollect, Dr. Fahrenwald came in here one day and the matter was taken up by him." From a letter of the latter hereinafter referred to, it will appear that the difficulty incident to placing the proposed noncooled roll in the Costello furnace was not the form of the roll which the Sharon engineers desired, but the difficulties in the casting of such a roll. This casting difficulty, as appears by the letter, was the thing which others had not "the courage to tackle," but Dr. Fahrenwald, for his company, had the courage to cast, and did in fact cast. Malborn and two witnesses, Tyrrel and Warren, then and there discussed the matter with Dr. Fahrenwald. This discussion took place on Saturday, June 13, 1925. Malborn's account of the talk is as follows: "I don't believe we sent for Dr. Fahrenwald for a discussion of non-cooled shafts on June 13th; as far as my recollection serves me, he dropped in here. When Dr. Fahrenwald came in on June 13, 1925, there were present Mr. Warren, Mr. Tyrrel, Mr. Draper and myself. At this visit of Dr. Fahrenwald's, the discussion was particularly, of course, on a dry shaft. We wanted a shaft that we would not have to use water in and wanted a shaft that would not cause us to have to change the mechanical equipment on our furnace. We didn't know anything at all about the strengths of the alloys. We knew what we wanted. We didn't know how large it would have to be or how small it would have to be. We didn't know how thick it would have to be. We knew that we wanted, if possible, to utilize the same drive and the same bearings, and it was put up to Dr. Fahrenwald in that way. We told Dr. Fahrenwald what we wanted, a general discussion on the possibility of using a hollow dry shaft. While I would not like to say positively that

I asked Dr. Fahrenwald whether he could make a hollow shaft for us, it goes without saying that he would be asked that question by either myself or one of the others present in the meeting, because we were after a hollow shaft. We had already tried a solid shaft and it failed miserably. After we had asked Dr. Fahrenwald if he could make shafts for this furnace, sketches were made by Mr. Tyrrel, and Mr. Warren—there were half a dozen different types of sketches made on the furnace, including the discussion of the shape of the shaft. From a final sketch a drawing was made, which drawing was sent to Dr. Fahrenwald, I believe, or he took it with him. The final sketch, as far as I can recollect, was a shaft of a large diameter in the middle, tapering off on the ends to go through the brickwork and to fit our journals. The strength of the material and thickness of that was left entirely up to Dr. Fahrenwald." In answer to the question, "Whose idea was it to have the ends of the shaft of reduced diameter?" Malborn testified: "I think I have already answered that, probably not so clear as you might like; but it was very obvious to any engineer or alloy man that we have known, and a solid shaft had failed and we wanted a hollow shaft. We didn't know anything about the strength, but we had to get that diameter sufficient to be strong enough to stand up under that temperature and also carry a disc. I mean the diameter of the middle of the shaft would obviously have to be larger than the ends. Our journals determined the dimensions of the ends of the shaft. The present equipment we had in the furnace most certainly fixed the size of the ends of the shaft, because we didn't want to change the journals. We didn't want to change any bearings, and that was squarely put up to Dr. Fahrenwald in our discussion. So naturally when he decided from his knowledge of the strength of the material that the diameter of the shaft on the furnace would have to be much larger than the diameter of the shaft that went in the journals, it would naturally bring a slope; and furthermore, I don't think it was very clear at that day, even in Dr. Fahrenwald's mind, exactly how it could be made, because the foundry practice had to enter into it, of which we knew nothing, and he would have to discuss that with his own people. The final sketch that was made up at the conference showed, to my recollection, a shaft with the reduced ends. As to whether the design of this sketch as drawn up was the idea of any one person or the joint ideas of the people present, namely, Mr. Tyrrel, Mr. Warren, Dr. Fahrenwald and

388

myself, I would say I honestly believe it was a joint idea. It was discussed by one just as much as the other; each added their little contribution to it. I am speaking particularly of the last sketch. There was no discussion whatever, at this conference, about putting any plugs in the ends of the shaft. After this conference on Saturday, June 13th, the next thing, as far as I can recollect, was that we got a request from Dr. Fahrenwald for some more information, and we got some blueprints back again. I would recognize the blueprints, and the blueprints which you show me were the ones which were received with Dr. Fahrenwald's letter of June 17th."

By stipulation, it is agreed that the testimony of the engineers Tyrrel and Warren would, if taken, be to the same effect. When called, Dr. Fahrenwald did not contradict the testimony of these witnesses. From uncontradicted proof it is clear, first, that Malborn and his associates suggested the use of a hollow, noncooled roll; second, that the bearings of such roll must be reduced in size to fit the bearings of their Costello furnace; third, that Fahrenwald was asked if he could make a noncooled roll with bearing reduced to fit the Costello furnace; fourth, that several preliminary sketches of the desired roll were then made by Tyrrel and Draper, and after discussion, a final sketch was then made by the Sharon people and given to Dr. Fahrenwald or was afterwards sent him; fifth, that the casting of such a roll was the engineering work which Fahrenwald was to take up and report upon. From these facts it follows that Fahrenwald was not the sole inventor of such roll, and that the conclusions drawn by Malborn, Tyrrel, and Draper, namely, "As to whether the design of this sketch as drawn up was the idea of any one person or the joint idea of the persons present, namely, Mr. Tyrrel, Mr. Warren, Dr. Fahrenwald and myself, I would say I honestly believe it was a joint idea. It was discussed by one just as much as the other; each added their little contribution to it. I am speaking particularly of the last sketch," were warranted.

Moreover, the letter of Fahrenwald of June 17, 1925, confirms, and is in entire accord with, that conclusion. Without quoting it entirely, though all of it is in line with the part quoted, we note that Dr. Fahrenwald, immediately following the Sharon interview,

while the matter was fresh in mind, wrote as follows: "Following our discussion of Saturday regarding the most desirable manner in which to supply shafts for the proposed test in your present furnace, I have discussed this matter in detail with various men of our Production Department and I find that it is possible to make a shaft for this purpose with ends so restricted that a one-piece shaft with machined ends to fit your present bearings can be made without any great difficulty. I am accordingly submitting prints not only of the proposed straight cylindrical type of shaft, into which you propose inserting steel bearing pieces, but a sketch showing also a one-piece non-cooled alloy shaft." It will be noted he makes no claim of invention, of his having been the only inventor of the roll or of the holes therein on which he now lays such great stress.

Concerning the meeting at Sharon and the conversation there had, Fahrenwald contradicts the three witnesses. His testimony is: "Positively not one word was said at the plant of the Sharon Steel Hoop Company upon the occasion of my visit there in June, 1925, about which I testified, regarding this double bottle-neck form of hollow non-cooled shaft." His account of the origin of the alleged invention is as follows: "After I left Sharon Steel Hoop and before I got back to the shop at Chicago Heights, I devised or conceived the idea of getting away from all of these difficulties by making the required larger hollow portion and the specified small diameter, and joining these two in such a way that the feared thermal expansion stresses would not be permitted effective play." As between three disinterested witnesses, on the one hand, confirmed by Fahrenwald's letter of June 17th, and Fahrenwald, on the other hand, who is interested in sustaining the patent, we believe the testimony of the former, and hold Fahrenwald was not the sole inventor.

Such being our conclusion on the basis of sole invention, and without discussing other phases of the case, all of which have had due consideration, we limit ourselves to holding the bill should have been dismissed on that ground, and direct the record be remanded to the lower court, with direction to dismiss the bill because Fahrenwald was not the sole inventor of the alleged invention.