## COLD METAL PROCESS CO. v. UNITED ENGINEERING & FOUNDRY CO.
### No. 2506.

District Court, W. D. Pennsylvania.
Jan. 9, 1933.

Thomas G. Haight, of Jersey City, N. J., and Byrnes, Stebbins, Parmelee & Blenko, of Pittsburgh, Pa. (by Clarence P. Byrnes, George E. Stebbins, Walter J. Blenko, and Edward Hoopes, 3d., all of Pittsburgh, Pa.) and Reed, Smith, Shaw & McClay, of Pittsburgh, Pa. (by John J. Heard, of Pittsburgh, Pa.), for plaintiff.

Melville Church, of Washington, D. C., and Brown, Critchlow & Flick, of Pittsburgh, Pa. (by Jo. Baily Brown and Paul N. Critchlow, both of Pittsburgh, Pa.), and Weil, Christy & Weil, of Pittsburgh, Pa. (by A. Leo Weil, and J. Smith Christy, both of Pittsburgh, Pa.), for defendant.

McVICAR, District Judge.

The court makes the following findings of fact and conclusions of law:

## Findings of Fact.

(1) Plaintiff, the Cold Metal Process Company, is a corporation of Ohio, having a place of business at Youngstown, Ohio. Defendant, United Engineering & Foundry Company, is a Pennsylvania corporation having a place of business at Pittsburgh, in the Western District of Pennsylvania.

(2) The patent in suit, No. 1,779,195, issued October 21, 1930, covers a method and apparatus for rolling thin, sheetlike material. Abram P. Steckel is the inventor. Plaintiff is the owner by assignment from Steckel.

(3) Sheets are used for a variety of purposes, as, for example, roofing, the making of utensils and various formed parts. Such material must have a good surface, and is usually under 10 gauge (.1379″) in thickness. There was and is a great demand for thin material having a high ratio of width to thickness. Typical products made from such material are radiators and radiator shells; hub caps, stainless steel veneer for steel spokes, light shells, covering for airplane wings, cans, metal ceilings, stampings, toys, weather stripping, razor blades, textile machine parts, etc. A very large tonnage of high-ratio steel is coated with tin to make so-called "tin plate" for use in tin cans. There is a large demand for tin plate.

(4) The difficulties of rolling thin metal increase as the ratio of width to thickness increases, and the difficulties become so marked at a ratio of about 400 to 1 that this figure constitutes a dividing line between high and low ratio material. It is necessary to use extraordinary precautions in rolling high-ratio material, and it has been much more costly than low-ratio material. There has always been a constant demand from the steel manufacturers for mills which would produce more product and better product than existing mills.

(5) Prior to 1923 thin steel was rolled by three processes as follows: (1) Pack rolling; (2) hot strip rolling; (3) cold strip rolling.

(6) Pack rolling is performed by first heating so-called sheet bars which are manually fed through the rolls of a sheet mill by a workman standing on the entering side of the mill. As they issue from between the rolls they are caught by a man standing on the delivery side, lifted up and handed back over the top of the mill to the first workman. This process is continued until the bar has been reduced to a thickness where it is impracticable to go any further. Then two such pieces are laid on top of one another and the rolling is continued. After reheating, the metal is further rolled and then doubled upon itself so as to make it four plies thick, the rolling continuing in this fashion until the desired thinness is reached. The finished packs may contain 4, 8, or 16 plies. It is necessary to pile up the sheets and roll them in packs because, in this hand process, it is impossible to roll single sheets with sufficient accuracy.

(7) Pack rolling is carried out on 2-high mills having ordinary brass bearings. The rolls employed are 28 to 32 inches in diameter. As the sheets are passed through the mill, the rolls become hot and expand. Heat is also produced by the friction of the roll neck on the brasses. The heat of the steel and the heat of friction in the necks both have an effect on the expansion of the roll body. It is necessary for the workman to control these influences in order to get a merchantable sheet. He uses steam and flame jets on the rolls for this purpose.

(8) In starting the run of a mill for the week it requires about eight hours of rolling in order to bring the rolls up to the right temperature and shape for rolling tin plate accurately. If the middle portion of the roll expands too much, it produces a buckled pack, while if the end portions of the roll expand too much it makes a riffled pack. To be commercially flat, the material must be free of buckles or wrinkles.

(9) Because of the delicacy of controlling

the roll shape, great skill is needed to operate a sheet mill, and ordinarily it requires from four to six years to learn the business.

(10) There are limitations on the size of the sheets which can be produced by pack rolling, because of the limited ability of the workmen to handle the material. There are limitations on thickness due to the difficulties in controlling the roll pass contour. The pack rolling process is essentially slow, and cannot be speeded up because of the limitations on the workmen.

(11) There are further limitations on the process due to scrap loss. Buckled and riffled packs are difficult or impossible to separate. The edges of the packs have to be sheared off to make the sheets square, thus increasing the scrap loss. It is necessary to use expensive materials such as phosphorous and silicon in the steel and to make the steel of special analysis in order to prevent sticking of the sheets together.

(12) It is impossible to get extreme accuracy of product in pack rolling, and about the best workmen are able to do is to get within 10 per cent. of the thickness on tin plate and 8 per cent. of the thickness on sheets.

(13) Pack rolling is hot, hard work because of the heat of the mill, the furnace, and other equipment. It is generally known as a man-killing job.

(14) Hot strip rolling, prior to 1923, was carried out on 2-high mills with brasses. The process consists in passing a hot slab between the rolls and rolling it out into a long, thin ribbonlike strip. This is usually done in a continuous mill. By a continuous mill is meant a multiplicity of stands set in a row one after the other so that the piece being rolled is in one or more stands at one time.

(15) Despite a great demand for high-ratio material, a ratio of 200 to 1 was as high as could be gotten with the limitations of the art prior to 1923. This is far below the dividing ratio (400 to 1) between high and low ratio material.

(16) The essential difference between cold strip rolling and hot strip rolling is that in cold strip rolling the material fed to the rolls is cold or at room temperature. Hot rolled strip, pickled to get the scale off the surface, is the material which is fed to the cold mills.

(17) In the old cold rolling process it was necessary to stop at intervals to anneal the steel and thereby soften it so as to permit of further cold rolling.

(18) Cold rolling is advantageous, in that it makes it possible to reduce the steel to thinner gauges than can be done by hot rolling; a highly finished surface is obtainable; and it is possible to get pieces which are of lengths impossible of production by pack rolling.

(19) The difficulties of pass distortion in cold mills provided with brass bearings are the same, due to roll neck heating, as in the pack rolling process, but are emphasized by the high pressures. The pressures in cold rolling are enormously high, and may be in the neighborhood of 40,000 pounds per inch of length of the roll, so that, for example, in rolling a piece 10 inches wide, the total pressure required may be in the neighborhood of 400,000 pounds. The high pressure breaks the oil film in the bearing, thus increasing the frictional resistance. The frictional resistance in brasses is high and variable, in consequence of which the amount of heat generated is variable.

(20) The amount of heat generated in the bearings is proportional to the speed. If the speed is doubled, the amount of heat generated is doubled. If it were attempted to increase the speed of the old 2-high cold rolling mills with brasses, the result would have been to distort the pass and destroy the bearing. Because of these limitations, the speed was necessarily slow, and this was particularly true as the ratio increased. When a ratio of 250 to 1 was reached, it became necessary to reduce the speed, and, when the dividing ratio of 400 to 1 was reached, it became necessary to roll at the lowest speeds of the mill. If this was not done, the brasses heated up, causing riffled edges or causing the piece to run into the guides. For rolling high-ratio steel the maximum speed was 100 to 135 feet per minute, and, if higher speeds were attempted, buckling or riffling resulted. The variation in thickness of metal which causes riffling is so microscopic it cannot be measured by the finest micrometers.

(21) The original application 648,761 for the patent in suit was filed in the United States Patent Office June 30, 1923. Divisional application, serial No. 412,742, was filed December 9, 1929. Upon this divisional application the patent in suit, 1,779,195, was granted. Upon the original application patent 1,744,016 was granted.

(22) May 22, 1928, Steckel amended his original application 648,761 by adding thereto claims corresponding from 1 to 4, inclusive, and 6 to 13, inclusive, of the Biggert and Johnson patent 1,654,235.

(23) In the patent in suit it is stated:

"The invention relates to an improved rolling mill and method of rolling whereby superior results are obtained. It applies particularly to the rolling of thin sheet-like material in long lengths. It provides a mill which may be operated at high speeds and permits of rolling metal strips of practically unlimited length. In cold rolling I have successfully operated a mill of the character herein disclosed at speeds up to 1200 feet per minute."

(24) In the patent in suit it is further stated: "I provide working rolls having backing rolls of larger diameter and anti-friction mounting for said backing rolls of a character adapted to withstand the rolling pressures encountered and the high speeds which are employed. In a preferred form of the invention the backing rolls are provided with necks which carry the anti-friction bearings, these necks being of sufficient size to withstand the rolling pressure, and the diameter of the backing roll body relative to the diameter of the working roll being of exaggerated size so as to permit of using anti-friction bearings of sufficient size for the conditions encountered. It is important that the bearings be of adequate size and of proper character, and in the form of the invention herein particularly described, roller bearings employing spaced-apart rollers are used."

(25) In the patent in suit it is further stated: "Prior to my invention it was generally considered impossible to cold roll at speeds in excess of 150 to 200 feet per minute, whereas by the term 'high speed' I contemplate speeds several times this figure, or in the order of multiples of the speeds commonly employed. In hot rolling fairly high speeds have been employed in the manufacture of extremely narrow material. In such case the roll neck bearings have been subjected to only relatively light loads, and such speeds prior to my invention were not applicable to wider mills or to mills where there was marked pressure on the bearings. By my invention the limitations of speed on both hot and cold mills are removed."

(26) In the patent in suit it is further stated: "Anti-friction bearings of the proper character will operate continuously with but little temperature rise. They therefore limit the frictional resistance of the backing rolls to rotation below a point where the active pass contour is adversely affected. Where the roller bearings are applied to the backing roll necks they eliminate the heating of such necks, which heat adversely affects the shape of the working roll body. Stated in another way, the anti-friction bearings on the necks are effective for limiting the rise in temperature of such necks to such a point that variations in the contour of the backing rolls are controlled within such limits as to substantially prevent buckling or wrinkling of the thin material passed between the working rolls."

(27) The patent in suit further states: "My invention is also highly advantageous in that the amount of power required is markedly reduced, and the anti-friction bearings are so situated that they are amply protected, being a considerable distance removed from the actual pass. They are not affected by grease, scale, dirt or water, if any of these be present at the point where the working rolls engage the material."

(28) In the patent in suit it is further stated: "I prefer to employ backing rolls whose diameter is at least twice the diameter of the working rolls, as this permits, in a mill of proper design in the practical range of sizes, of using roller bearings of such size that they will last indefinitely under the severe conditions of service. This ratio should be materially increased for high speed cold rolling, because of the much greater pressures encountered. Also, if it is desired to produce a product which is practically free from heavy center or 'crown,' the ratio of backing roll diameter to working roll diameter should be considerably greater than 2.

"For example, in cold rolling steel 7 inches wide by .001 inches thick, I have successfully produced material having a crown less than .0001 inches in a mill having a ratio of backing roll diameter to working roll diameter of 10, the backing rolls being 20 inches in diameter and the working rolls being 2 inches in diameter. I have also successfully rolled steel 16 inches wide by .002 inches thick with a center crown of less than .0001 in a mill where the ratio was 8, the backing rolls being 24 inches in diameter and the working rolls being 3 inches in diameter. Mills with ratios on the order of 2-to-1 show a center crown which is very objectionable in certain cases, although in hot rolling it is generally considered desirable to have a certain amount of crown in the product for the purpose of aiding the material to 'track' through the center of the mill."

(29) The patent in suit contains 17 claims. Claims 1 and 15 are representative and read:

"1. In the method of rolling thin sheet or strip material in a mill having working rolls, and backing rolls, of larger diameter, for the

working rolls, the steps consisting in limiting the rise in temperature of the backing roll necks to such a point that variations in the contour of the backing rolls are controlled within such limits as to substantially prevent buckling or wrinkling of the thin material passed between the working rolls."

"15. A mill for rolling sheet or strip like material of substantially uniform thickness comprising a working roll of substantially uniform diameter in the body portion provided with a backing roll of larger diameter and anti-friction mounting for said backing roll, the backing roll being of sufficient diameter to permit of using an anti-friction mounting of a character to withstand the rolling pressures encountered and to operate for extended periods of time at speeds which are on the order of multiples of speeds commonly employed in the rolling of such material."

(30) On December 23, 1932, plaintiff filed a disclaimer in the Patent Office in respect of the patent in suit whereby it disclaimed from the scope of claims 1, 2, 5, 9, and 10, "limiting the rise in temperature of the backing roll necks by limiting the mill speeds to those employed prior to Steckel's invention for rolling such material," and disclaimed from the scope of claims 6, 11, 12, 14, and 16 "any mill having backing roll bearings of a character to limit the mill speeds to those employed prior to Steckel's invention for rolling such material."

(31) The original Steckel application, filed June 30, 1923, disclosed two working rolls and two backing rolls; the working rolls being smaller in diameter than the backing rolls. The necks of the backing rolls are strong enough to withstand the rolling pressures. High speed antifriction spaced roller bearings were to be used for the necks of the backing rolls of sufficient strength to withstand roll pressures in continuous operation at high speeds.

(32) Any person skilled in the art could build and operate a mill in conformity to the disclosure in the original Steckel application which would successfully roll high-ratio strip at high speed.

(33) The disclosures of the original Steckel application are also disclosed in the divisional application of the patent in suit.

(34) The Steckel mill vastly extends the possible width of rolling any gauge material, and enables it to be made at much higher speeds.

(35) The character of the product is superior. It can be rolled within much closer tolerances than by prior processes; the tolerances being 2½ per cent. as against 8 or 10 per cent. in the pack rolling process. The strip produced on the patented mill is much flatter than that produced by old processes, and this means a great saving to the user, because he gets a greater number of lineal feet of strip per pound. It is possible by the patented mill to produce strip having ratios much higher than those previously obtainable. Ratios as high as 11,000 to 1 have been successfully rolled on the Steckel mill.

(36) The conditions under which the men work are vastly improved.

(37) The cost of production is greatly reduced. For example, in the case of tin plate the saving in cost is approximately $15 per ton. This is a saving of approximately 20 per cent., which saving is especially high in the steel business, where a saving of even 2 or 3 per cent. is considered one which will justify considerable effort. The saving is due to the fact that few men are required, the mill runs at high speed, and intermediate annealing is eliminated. The cost of annealing amounts to several dollars per ton.

(38) One Steckel mill displaces two of the old hot tin mills.

(39) In the case of difficult rollable alloys, such as rustless iron and stainless steel, the manufacturing saving amounts to 50 per cent. or more.

(40) The patented mill has been used for rolling tin plate, low-carbon steel, high-carbon steel, silicon steel, stainless steel, rustless iron, pure nickel, Monel metal, brass, copper, bronze bimetallic strip, aluminum zinc, and various other alloys.

(41) It is possible by using the patented mill, and because of the elimination of annealing, to reduce the time required for filling orders. For example, material which would have required three weeks to produce has been produced in four days.

(42) The public has benefited by the savings obtainable from the use of the patented mill. Since 1925 plaintiff's prices have been reduced by 49 to 65 per cent., whereas the price of standard steel commodities, such as bars, have been reduced only 25 per cent. This comparison shows that the reduction in price is greatly in excess of reductions due to declining commodity prices.

(43) The Cold Metal Process Company was incorporated in April of 1926, and now 51 mills representing an investment of over $1,700,000 have been built. A large number of these mills are operated by steel manufacturers operating under a license from plain-

tiff. Among the licensees are Allegheny Steel Company, American Steel & Wire Company, Crucible Steel Company, International Nickel Company, and Weirton Steel Company. Despite the present industrial conditions, Weirton Steel Company has for months past operated its Steckel mill 24 hours a day and has two more such mills on order. The mills are used, not only in the United States, but also in foreign countries, such as England and Sweden.

(44) In addition to the cold mills above referred to, plaintiff has built a hot mill which has been in successful operation at the Briar Hill works of the Youngstown Sheet & Tube Company. In this hot mill the work rolls are driven.

(45) Up to August 31, 1932, licensees had paid royalties aggregating over $132,000, most of the royalties being paid at the rate of 5 per cent. of the selling price of the product.

(46) At the present time the plaintiff has pending negotiations for more than $4,500,000 worth of mills, and has been visited by practically every important steel manufacturer in the United States and from a large number of foreign countries. A number of foreign manufacturers have come to the United States especially to see the Steckel mill, and have spent two to six weeks studying it.

(47) Working rolls, backing rolls, and roller bearings were in the art prior to the Steckel invention. Steckel was the first person to adjust, apportion, and size these elements in a rolling mill so that the cold rolling of high-ratio strip steel could be done with high speed. Steckel discovered a new combination of old elements which produced a new and useful result.

(48) Steckel conceived the invention contained in the patent in suit in July, 1922, and was diligent thereafter in reducing it to practice.

(49) In 1909 Daniel A. Keating designed and installed at the plant of the American Tube & Stamping Company, Bridgeport, Conn., a mill having working rolls 2″ in diameter and backing rolls 4″ in diameter; the two backing rolls having necks 2½″ in diameter. Two supplementary backing rolls were provided for the purpose of holding the working rolls in line under the backing rolls. The backing rolls as designed were mounted in brass bearings which were subsequently changed to quill type bearings.

(50) The American Tube & Stamping

Company's 2″ mill was used about a year. It had little, if any, commercial success. Some of its product, by reason of buckling and wavy edges, had to be further processed to make it suitable for commercial use. It was superseded by the company's 3″ mill.

(51) In 1910 and 1911 Keating built and installed in the American Tube & Stamping Company's plant at Bridgeport, Conn., five rolling mills with driven working rolls 3″ in diameter; each working roll being backed by two backing rolls 5″ in diameter. The backing rolls having necks 3″ in diameter mounted with quill type bearings.

(52) The quill type bearing consists of an outer shell surrounding the roll neck; the annular space between neck and shell being filled with long, slender pins.

(53) The American Tube & Stamping Company has installed eight of the 3″ mills aforesaid. Some of them have been in use since 1910 or 1911 without change of design.

(54) In 1920 the Spencer Wire Company at Worcester, Mass., built and installed in its plant two mills identical in design with that of the 3″ mills of the American Tube & Stamping Company.

(55) Cooling water is employed in the backing rolls of the American Tube & Stamping Company's mills for cooling purposes.

(56) Heavy pressure on the pins causes generation of heat and wear of the pins so that they have to be removed and replaced about once a week.

(57) The Keating mill is a slow speed mill on account of heat. In ordinary draughts it runs about 160 feet per minute.

(58) The Keating mill was well known by the trade and was known by the Patent Office Examiners when they passed upon the applications of the patent in suit and that of Biggert and Johnson.

(59) The patent in suit is not anticipated by the Kriwan patent 1,360,959, or by the Coryell patent 1,737,185, or by any of the patents or publications cited by defendant.

(60) The defendant constructed a 4-high roller bearing mill for the Rome Brass & Copper Company, which was put in operation in December, 1925. This was the first mill constructed by defendant in accordance with the Biggert and Johnson invention as set forth in patent 1,654,235, which was issued December 27, 1927.

(61) The Rome mill when placed in operation was in a highly experimental stage.

(62) There is no evidence of the date that

the Rome mill was placed in successful commercial operation.

(63) The first knowledge that Steckel and plaintiff had of the Rome mill was in the late summer or fall of 1926.

(64) Defendant failed to prove beyond a reasonable doubt that the Rome mill was in public use for two years prior to May 22, 1928.

(65) The firm of Byrnes, Stebbins, Parmelee & Blenko have been the attorneys for Steckel and plaintiff in all matters relating to the patent in suit from the date of the original application, June 30, 1923, to the present time. Prior to June 30, 1923, and continuing until about January 1, 1929, the same firm of attorneys represented the defendant in its patent matters, which included the application for the Biggert and Johnson patent 1,654,235, which contained common subject-matter with the patent in suit.

(66) The Steckel application and the Biggert and Johnson application were handled by different attorneys of the Byrnes, Stebbins, Parmelee & Blenko firm for some time without the knowledge of either attorney that the other application was being handled by the firm aforesaid. Upon discovery that the firm was handling both applications, which contained a common subject-matter, the plaintiff and defendant were notified. The attorneys offered to withdraw as attorneys for both parties. This offer was refused by both parties, and as a result Byrnes, Stebbins, Parmelee & Blenko continued as the attorneys for both plaintiff and defendant with their knowledge and consent until some time in January, 1929.

(67) While Byrnes, Stebbins, Parmelee & Blenko were attorneys for plaintiff and defendant, plaintiff and defendant executed a license contract bearing date June 20, 1927, claims 1 to 4 and 6 to 13 of the Biggert and Johnson patent were added to the Steckel application, and Steckel was decreed priority of invention over the Biggert and Johnson invention in interference proceedings.

(68) There is no evidence that the firm of Byrnes, Stebbins, Parmelee & Blenko were guilty of fraud in their dealings with either the plaintiff or defendant in the matters aforesaid.

(69) The four mills complained of as to infringement are: Illinois Steel Company—continuous hot mill; Otis Steel Company—continuous hot mill; Wallingford Steel Company—single stand cold mill; and defendant's Youngstown mill—single stand cold mill. Each of said mills was in whole or in part either manufactured, sold, or used by defendant subsequent to October 21, 1930, the date of issue of the patent in suit, and prior to March 7, 1931, the date of filing of the bill of complaint.

(70) The ratios of the materials which these mills were designed to roll and are capable of producing are as follows:

Illinois mill ..................... 720 to 1
Otis mill ....................... 865 to 1
Wallingford mill ...............1200 to 1
Youngstown mill ...............1400 to 1

These ratios are representative of material which is of great thinness relative to its width and known in the art as strip steel. The term "strip sheet" implies wide, very thin strip.

(71) The speeds of defendant's Illinois and Otis mill are much higher than the speeds employed for the rolling of material of like ratio prior to 1923. Such material was not hot rolled in single thickness prior to 1923, but was rolled in short packs. The finishing speed of the Illinois mills is from 342 feet per minute minimum to 684 feet per minute maximum. The finishing speed of the Otis mill is from 600 feet per minute minimum to 1,200 feet per minute maximum.

(72) The Wallingford mill has commercially produced high-ratio material 12 inches wide by .020 inches thick (ratio 600 to 1) at a speed of 320 feet per minute. The Youngstown mill uses work rolls of different sizes. When 6-inch rolls are used, they run at 314 to 740 feet per minute. When 10-inch rolls are used, they run at 525 to 1,245 feet per minute; and, when 12-inch rolls are used, they run at 628 to 1,495 feet per minute. The speeds of the Youngstown and Wallingford mills are on the order of multiples of speeds used prior to 1923 for rolling high-ratio material.

(73) Defendant's Youngstown mill is open to the public, is openly demonstrated, and is used as a means of interesting prospective customers in 4-high mills and the sale of 4-high mills to them.

(74) In each of the mills complained of the backing rolls are of larger diameter than the working rolls, being in each case more than twice the diameter of the working rolls. In each case the backing rolls have necks of sufficient strength to withstand the rolling pressure, these necks having antifriction roller bearings encircling them. The backing roll bearings in each case consist of an inner sleeve surrounded by rollers spaced apart in

a cage, outside of which is an outer casing. These bearings are of a character to withstand the rolling pressures encountered in the defendant's mills and to operate at the speeds employed in such mills for extended periods of time. In each case the diameter of the backing roll bodies is greater than the outside diameter of the roller bearing employed, and the necks of the backing rolls are larger than the diameter of the working rolls. The diameters of the backing roll bodies relative to the diameters of the working roll are such as to permit of the use of antifriction bearings of sufficient size to withstand the rolling pressure.

(75) In each of defendant's mills the work rolls are driven, the necks of the working rolls extending out and being provided with a wobbler connection to the driving means. The necks extend between the roller bearings for the backing rolls in order to make the connection.

(76) Defendant's Otis and Illinois mills have a plurality of roll stand and are of the continuous type; the work piece being engaged by more than one stand of rolls at the same time.

(77) Defendant's mills under normal conditions of operation will produce commercially flat material without buckles or wrinkles, because the antifriction bearings which defendant employs limit the rise in temperature of the backing roll necks to the point where the variations in the contour of the backing rolls are controlled within such limits as to substantially prevent buckling or wrinkling of the sheet being rolled. The pass contour would be adversely affected if brasses were used in these mills instead of roller bearings, and it was attempted to operate them at the speeds specified. The pass contour is such that material heating of the backing roll necks would cause such unequal expansion of the backing roll bodies as would distort the pass sufficiently to cause buckling or wrinkling of the product.

(78) The ratio of the product rolled in defendant's Illinois and Otis mills is such that the direction of travel in the mills cannot be controlled by side guides.

(79) In defendant's mills the roll passes are of such width that the available space in 2-high mills of the same width would prevent the use of roller bearings of the necessary load-carrying capacity. The intermediate (working) rolls of defendant's several mills are of sufficiently small diameter to reduce the separating force in the mill to such a point that the antifriction bearings employed require a smaller space than those which would be required in a 2-high mill of the same width.

(80) In defendant's Illinois and Otis mills the successive passes are of such width and the mills are effective for taking such drafts that the product of the mill is of such width and thickness that slight variations arising from a change in temperature of the backing roll necks would buckle or wrinkle thin material during its passage through the mill. The antifriction bearings of defendant's several mills prevent such wrinkling, which would occur if there were no antifriction bearings used.

(81) In defendant's several mills the working rolls are of substantially uniform diameter in the body portion.

(82) The speeds of defendant's mills are not limited to those employed prior to Steckel's invention for rolling the material rolled in defendant's mills.

(83) In defendant's several mills the backing roller bearings are not of a character to limit the mill speeds to those employed prior to Steckel's invention for the rolling of material rolled on defendant's mills.

(84) Prior to the filing of the bill of complaint, defendant was notified of its alleged infringement of the patent in suit.

(85) Since the issuance of the patent in suit, plaintiff has marked its mills "patented" and with the number of the patent in suit.

(86) The agreement between plaintiff and defendant of June 20, 1927, provided, inter alia:

"1. The parties will, through their appropriate officers, immediately hold a conference at which their patent attorneys, Byrnes, Stebbins & Parmelee, shall be authorized by both parties to suggest claims covering certain subject matter common to both parties' applications, and which it is understood are not at the present time being presented in Cold Metals' applications; together with a plan for securing the allowance of such claims;

"2. Cold Metals shall not, after such conference, present in its applications claims of the scope suggested at the conference, or directed to the subject-matter common to both parties' applications, if such claims are broader or of different scope than the claims now presented in Cold Metals' applications, except with the agreement and cooperation of United.

"3. When and if such claim or claims to common subject-matter are granted in any

patent issued on Cold Metals' applications, Cold Metals shall grant to United a license to make, use and sell rolling mills under such claim or claims, which license shall be exclusive to United for 4-high hot mills and for 4-high cold mills, in which the major portion of the power required by a roll stand is supplied to the rolls directly and not through tension exerted on the material for pulling it through the rolls; Cold Metals, however, reserving the right to make or have made for its own use and to use in its own plant or plants such hot and cold mills, and provided further that Cold Metals shall have the right to make, use and sell, or to license others to make, use or sell, such 4-high hot mills in combination with means for coiling the rolled strip between passes as described in the pending application of A. P. Steckel, Serial No. 198,915, filed June 15, 1927.

"4. Immediately after such conference and without waiting for such claims to be secured, the parties shall negotiate the payment to be made by United to Cold Metals for such license, when and if granted. If the parties cannot agree upon such payment, the matter shall be submitted to three arbitrators, whose majority decision shall be accepted as final by both parties."

(87) This contract was not rescinded prior to the filing of the bill in this case, and at that time was a valid subsisting contract between the parties.

(88) Defendant has not infringed the patent in suit. The acts aforesaid, which would have constituted infringement, are valid and proper under the license agreement of June 20, 1927.

### Conclusions of Law.

(1) Plaintiff is the owner of the patent in suit.

(2) Defendant has not infringed the patent in suit.

(3) The patent in suit contains invention, new and useful.

(4) The patent in suit is valid.

(5) The application for the patent in suit is a proper division of Steckel application serial No. 648,761, filed June 30, 1923.

(6) Said application serial No. 648,761 contains a full and adequate basis for the subject-matter of the claims in suit, and the patent in suit is entitled to the filing date of June 30, 1923.

(7) The patent in suit is not anticipated by any of the alleged prior uses or references cited by defendant.

(8) The patent in suit is not invalidated by reason of the alleged use of the Rome mill more than two years prior to the date of filing of the divisional application.

(9) Plaintiff is not barred from relief by reason of want of equity.

(10) The bill should be dismissed at the cost of plaintiff.

(11) The contract of June 20, 1927, between the plaintiff and defendant is a valid subsisting contract.

### Opinion.

This is a bill in equity for injunctive relief and damages to which the plaintiff alleges it is entitled as a result of defendant's infringement of the patent in suit 1,779,195. The defendant has alleged a number of defenses thereto which will be referred to hereinafter.

The invention of the patent in suit relates to a rolling mill and method of rolling thin sheetlike material in long lengths. The patent provides for two small working rolls, two large backing rolls, necks on the backing rolls large enough for mounting of spaced antifriction roller bearings. The mill is suitable for hot and cold rolling of high-ratio strips or sheets of steel. The patentee claims the rolling can be done at much higher speed than was formerly known to the art; also that the amount of power employed is greatly reduced.

Defendant contends that the patent in suit is anticipated by the Keating mills of the American Tube & Stamping Company. Defendant has not met the burden resting upon it of proving anticipation beyond a reasonable doubt. Coffin v. Ogden, 18 Wall. 120, 21 L. Ed. 821. The Keating mills are cluster mills with small working rolls, each working roll being supported by two large backing rolls. The necks of the backing rolls are mounted with a quill type bearing. This bearing consists of an outer shell surrounding the roll neck. The space between the neck and shell is filled with pins. These pins have to be replaced about once a week by reason of wear from heat generated by pressures. The heat generated requires the operation of the rolls slowly. The ordinary draught is operated at the rate of about 160 feet per minute. The Steckel mill, being a 4-high mill, consists of two small working rolls, two larger backing rolls, the necks of the backing rolls are mounted with antifriction spaced roller bearings. The adjustment, apportionment, size, and character of the working rolls, backing rolls, necks of the backing

rolls, and the mounting thereof are such that the bearing lasts as long as the rolls, and the heat is maintained at a temperature so that high-ratio strip steel may be commercially rolled at high speeds and at multiples greater than the Keating mills can be operated. This quality of speed is of great practical value to the trade.

Defendant contends that the patent in suit is invalid for lack of disclosure in Steckel's original application. Plaintiff admits: "We agreed at the argument, and we here agree once more, that unless the Court finds, as the Patent Office found, that Steckel is entitled to his 1923 date for these claims, the decision in this case must be for defendant. Steckel's own mills were in public use more than two years prior to the date of filing of his divisional application." Defendant's specific contention is that "Steckel's original patent application filed June 30, 1923, does not disclose the invention to which the claims in the patent in suit are directed, namely, means of and a method for the avoidance of wrinkling and buckling arising from heat generated in the journals of backing roll necks." Defendant, in support of its contention, cites Rev. St. § 4888 (35 USCA § 33), which reads: "Before any inventor or discoverer shall receive a patent for his invention or discovery he shall make application therefor, in writing, to the Commissioner of Patents, and shall file in the Patent Office a written description of the same, and of the manner and process of making, constructing, compounding, and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains, or with which it is most nearly connected, to make, construct, compound, and use the same."

The evidence establishes that the mill described in the divisional application of the patent in suit is the mill described in the original application; that the method and apparatus are the same; that any person skilled in the art can build the mill specified in the original application and produce high-ratio material at high speeds. This was admitted by defendant's expert, Fisk.

■ The mill specified in the original application does provide a means of and a method for the avoidance of wrinkling and buckling arising from heat generated in the journals of backing roll necks. A mill constructed in accordance with the original application would produce such a result. The provisions of R. S. § 4888, were complied with in the original application. It is not necessary that a patentee realize all the benefits of his invention or that all the benefits be described in his application. Westmoreland Specialty Co. v. Hogan, 167 F. 327, 328 (C. C. A. 3); Kohler v. Cline Electric Mfg. Co. and Westinghouse Electric & Mfg. Co. et al., 28 F. (2d) 405, 406 (D. C., N. D. Ill.); Diamond Rubber Company of New York v. Consolidated Rubber Tire Company, 220 U. S. 428, 435, 31 S. Ct. 444, 55 L. Ed. 527; Eames v. Andrews, 122 U. S. 40, 7 S. Ct. 1073, 30 L. Ed. 1064; Western Electric Co. v. Sperry Electric Co., 58 F. 186, 196 (C. C. A. 7); O'Reilly v. Morse, 15 How. 62, 14 L. Ed. 601; Dayton Engineering Laboratories Co. v. Kent, 260 F. 187, 193, 194 (D. C., E. D., Pa.); Jackson Fence Co. v. Peerless Wire Fence Co., 228 F. 691, 696 (C. C. A. 6); Morgan Engineering Co. v. Alliance Mach. Co., 176 F. 100, 107 (C. C. A. 6); Wagenhorst v. Hydraulic Steel Co., 27 F.(2d) 27 (C. C. A. 6); General Electric Co. v. Cooper Hewitt Electric Co., 249 F. 61, 63 (C. C. A. 6), and Cleveland Foundry Co. v. Detroit Vapor Stove Co., 131 F. 853, 857 (C. C. A. 6).

In Westmoreland Specialty Co. et al. v. Hogan, supra, it is stated: "The mere failure of a patentee to realize all the benefits and possibilities of his invention is not fatal."

In Jackson Fence Co. v. Peerless Wire Fence Co., supra, the court stated: "The patentee is entitled to the benefit of every function within the scope of the claims and actually possessed by his mechanism, even if he does not know of it at the time of patenting."

In Morgan Engineering Co. v. Alliance Machine Co., supra, the court stated: "Even if the patentee at the time of making his application did not know of this advantage, or knowing failed distinctly to express it, he, in view of what he did state and show, is entitled to have his invention considered with reference to it. Indeed, the crane cannot be constructed and operated in accordance with the plain terms of his description without observing and securing this advantage. This alone is sufficient."

■ Defendant contends that the patent in suit is invalid for lack of invention over the prior art. Steckel's combination of old elements, working rolls, backing rolls, and anti-friction spaced roller bearings, adjusted and apportioned in size, produced a new and useful result in the rolling of strip steel of high ratio at high speeds which required an exercise of the inventive skill. This is all the law

requires. Parks v. Booth, 102 U. S. 104, 26 L. Ed. 54; Boyer v. Keller Tool Co., 127 F. 130, 138 (C. C. A. 3); and Webster Loom Co. v. Higgins, 105 U. S. 580, 591, 26 L. Ed. 1177.

Defendant contends that the claims of the patent in suit are invalid by reason of public use of plaintiff's invention in the mill constructed by defendant for, and used by, the Rome Brass & Copper Company. Our Supreme Court has held that, where a patentee had disclosed an invention for which he did not make a claim, he could not make the same after the expiration of two years from the granting of a patent for such invention, in the absence of circumstances satisfactorily accounting for the delay. Chapman et al. v. Wintroath, 252 U. S. 126, 40 S. Ct. 234, 64 L. Ed. 491; Webster Co. v. Splitdorf Co., 264 U. S. 463, 44 S. Ct. 342, 68 L. Ed. 792. This rule has not been applied by the Supreme Court to public use of the invention. There is a divergence of opinion by lower courts as to whether it should be thus applied. But, if public use for two or more years is a barrier, it would not invalidate the claims of the patent in suit, for the reason that such a rule would not apply to the facts of this case. The patent in suit from the date of the filing of the original application contained claims which covered the Rome mill. Defendant contends that the Rome mill was placed in public use in December, 1925, that the claims in the patent in suit which covered the Rome mill were added to the Steckel application May 22, 1928, and therefore that the plaintiff was barred by laches. There is no evidence when the Rome mill was placed in successful use. It was highly experimental when operated in December of 1925. The building and installation of one mill is not a public use within the reason of the rule that we are now considering, as such a use is not likely to give notice to the public. In this case plaintiff did not receive knowledge of the Rome mill until the late summer or fall of 1926.

Defendant contends the bill should be dismissed for want of equity. This contention is based on the manner in which Byrnes, Stebbins, Parmelee & Blenko treated defendant while they were attorneys for plaintiff and defendant in the prosecution of the applications of Steckel and Biggert and Johnson which contained common subject-matter. There is no evidence of fraud exercised by these attorneys on defendant. On the contrary, it is established that, when the firm discovered the two applications were in their office, containing common subject-matter, they notified plaintiff and defendant and offered to withdraw as attorneys for both. Plaintiff and defendant declined to accept such offer, and directed Byrnes, Stebbins, Parmelee & Blenko to proceed as attorneys for both parties in the prosecution of their respective applications.

In Fahrenwald et al. v. Republic Iron & Steel Co., 61 F.(2d) 385, 386 (C. C. A. 3), the court said: "Undoubtedly the patent was valid on its face on the presumption arising from its grant, and the only inquiry the court could make was as to invalidity arising by reason of the Commissioner's power to issue it as not involving invention, that the applicant was not the first and sole inventor, and other elements going into its validity. But where, as here, there is no question of the authority of the Commissioner to issue the patent, and the patent issues, and the government which grants the patent takes no steps to set it aside, the patent stands, and those charged with infringement thereof are relegated to the statutory defenses provided for by statute. In that regard the Supreme Court, in Philadelphia, W. & B. Railroad Co. v. Dubois, 12 Wall. 47, 64, 20 L. Ed. 265, citing Providence Rubber Co. v. Goodyear, 9 Wall. 788, 19 L. Ed. 566, held a defendant is 'not at liberty to set up as a defence that the patent had been fraudulently obtained, no fraud appearing upon its face.' Moreover, reference may also be made to Walker on Patents, §§ 321, 322, 323; Briggs v. United Shoe Machinery Co., 239 U. S. 48, 36 S. Ct. 6, 60 L. Ed. 138; Giant Powder Co. v. Safety Nitro Powder Co. (C. C.) 19 F. 509; Railway Register Mfg. Co. v. North Hudson Co. R. Co. (C. C.) 23 F. 593; Eureka Co. v. Bailey Co., 11 Wall. 488, 20 L. Ed. 209. Of course, this does not mean a court may not inquire into misrepresentation made by the applicant in procuring his patent in so far as it relates to the statutory requirements for the grant of a patent. Walker (6th Ed.) vol. 1, p. 472, and Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U. S. 358, 48 S. Ct. 380, 72 L. Ed. 610."

Defendant contends that it cannot be charged with infringement, for the reason that the acts relied upon by plaintiff for infringement were done under a license contract between the plaintiff and the defendant.

While the applications of the plaintiff and defendant were pending in the Patent Office, they entered into a contract dated June 20, 1927, providing that, upon the allowance of certain claims to be added to

plaintiff's application, the plaintiff would grant a license to defendant to make, use, and sell rolling mills under such claims at a price to be agreed upon by the parties, and, if they failed to agree, the price to be fixed by arbitrators. On October 21, 1930, the claims referred to were allowed and defendant has made and used rolling mills covered by said claims.

■ Plaintiff contends that this contract was rescinded by plaintiff March 2, 1931, by virtue of certain acts of defendant prior to November 1930, in violation thereof. This contention cannot be sustained, for the reason that both parties recognized said contract as a valid and subsisting agreement by the steps taken by them to arbitrate in pursuance of the contract after the acts aforesaid and between November 14, 1930, and March 2, 1931, the latter date being the date that plaintiff wrote its rescinding letter to defendant, and this date was within a few days of the filing of the bill in this case.

■ Plaintiff contends that defendant is estopped from claiming under the license contract as it pleaded in addition thereto invalidity of the patent in suit. It is well established, where the owners of a patent bring an action on a license contract for royalty, the licensee is estopped from denying the licensor's title. The general rule also seems to be that, where the owner of a patent brings an action for infringement, the defendant may set up any defense he has, including nonvalidity and use under a license. National Manufacturing Co. v. Meyers, 7 F. 355 (C. C., S. D., Ohio); Niagara Fire Extinguisher Co. v. Hibbard, 179 F. 844 (C. C. A. 7); Tate v. Baltimore & Ohio R. Co., 229 F. 141 (C. C. A. 4); 48 C. J. 194, § 287; Pelham v. Edelmeyer, 15 F. 262, 264 (C. C., S. D., N. Y.).

There are some courts which hold that, where the owner of a patent brings an action for infringement and the defendant justifies his use under a license, he is estopped from setting up nonvalidity. Platt v. Fire-Extinguisher Co., 59 F. 897 (C. C. A. 3); National Clay Products Co. v. Heath Unit Tile Co., 40 F.(2d) 617 (C. C. A. 8); Tate v. Baltimore & Ohio R. R., 229 F. 141 (C. C. A. 4); International Burr Corporation v. Wood Grinding Service, 34 F.(2d) 905, 907 (C. C. A. 2).

I do not know of any case or rule of law which holds that in an action of infringement, where the defendant pleads license and nonvalidity, the defendant is estopped from setting up the defense of license. I do not know of any reason why he should be estopped. There is a reason for estoppel from pleading nonvalidity where the licensee exercises rights under the license.

The defense of license in the answer was pleaded in the alternative which the defendant, under Equity Rule 30 (28 USCA § 723), had the right to do regardless of consistency. Plaintiff had the right to test the sufficiency thereof by a motion to strike out this defense under rule 33 (28 USCA § 723). This plaintiff did not do. The case went to trial on the defenses, inter alia, of nonvalidity and license. It may be that defendant was estopped from setting up nonvalidity, as the rights it exercised were exercised under the license contract, but it is not estopped from justifying its conduct under the license agreement.

■ We have considered all the questions raised by counsel. The result of our labor is that we find the patent in suit valid, and that defendant has not infringed the same by reason of the license contract.

### Decree.

And now, to wit, this 9th day of January, 1933, this cause came on to be heard at this term, and was argued by counsel, and thereupon, upon consideration thereof, it was ordered, adjudged, and decreed as follows, viz.: That the bill be dismissed at the costs of the plaintiff.